2023 IL App (1st) 220501-U

THIRD DIVISION
August 9, 2023

No. 1-22-0501

**NOTICE**: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

# IN THE
# APPELLATE COURT OF ILLINOIS
# FIRST JUDICIAL DISTRICT

| | |
|---|---|
| URBAN GROWTH LIMITED PARTNERSHIP, a Delaware Limited Partnership, | ) Appeal from the<br>) Circuit Court of<br>) Cook County |
| Plaintiff-Appellee/Cross-Appellant, | ) |
| v. | ) No. 21 M 1701648 |
| NOORIA ENTERPRISES, INC., an Illinois Corporation, | ) Honorable<br>) Martin M. Moltz, |
| Defendant-Appellant/Cross-Appellee. | ) Judge, Presiding |

JUSTICE D. B. WALKER delivered the judgment of the court.
Presiding Justice McBride and Justice Van Tine concurred with the judgment.

**ORDER**

¶ 1    *Held*: We affirm the trial court's judgment awarding plaintiff $100,000 in damages and possession of the premises but remand the cause for further proceedings on plaintiff's petition for attorney fees and costs.

¶ 2    Defendant Nooria Enterprises, Inc. (Nooria) appeals the trial court's order granting possession of the premises to plaintiff Urban Growth Limited Partnership (Urban) and awarding Urban damages for unpaid rent. On appeal, Nooria contends that the trial court erred where (1) the lease specifically provided that Nooria need not pay rent if the premises was completely destroyed

by fire and Urban chose not to terminate the lease, and (2) the affirmative defense of commercial frustration/impossibility excused Nooria's performance under the lease. Urban contends on cross-appeal that the trial court erred in denying its petition for attorney fees where the lease entitled the prevailing party to recover reasonable fees. For the following reasons, we affirm the trial court's judgment awarding damages and possession of the premises to Urban, but we remand the matter for further proceedings on Urban's petition for attorney fees and costs.

¶ 3                                    I. BACKGROUND

¶ 4      Urban is the landlord of property located at 211 West Adams Street in Chicago, Illinois. The property consists of a parking garage, commonly known as Tower Self Park, with several small units on the ground level for commercial use.

¶ 5      Nooria operates numerous Dunkin Donuts stores throughout the city. On November 12, 2007, Nooria, through its president Amin Khowaja, entered into a lease agreement with Urban to rent one of Tower Self Park's commercial units. The original lease term ended in 2017, but Nooria exercised its 5-year lease option which extended the termination date to February 28, 2022. The lease referred to Tower Self Park as the "Parking Facility," and the 1,670 square foot unit leased to Nooria as the "Premises." When the lease was executed in 2007, the premises was a "vanilla box." Nooria spent 13 months converting the space into a functioning Dunkin Donuts store.

¶ 6      Pursuant to the lease, Nooria agreed to pay minimum rent of $9,741.67 per month in Year 1 with the amount increasing to $13,865.52 monthly by Year 10. The lease further provided:

    "2.01 Minimum Rental. Minimum rental hereunder *** shall be payable in monthly installments in advance, without any deduction or set off or prior demand, on the first day of each and every month throughout the lease term.

                                    * * *

5.01 <u>Maintenance, Repair, and Replacement by Tenant</u>. Tenant shall, at its expense, at all times repair, maintain, and replace (a) the interior of the Premises, together with exterior entrances, all glass, windows, and window moldings, (b) all fixtures, partitions, ceilings, floor coverings and utility lines in the Premises, and all plumbing and sewage facilities within the Premises including free flow up to utility owned sewer lines, (c) all doors, door openers, signs, equipment, machinery, and appliances (including lighting, heating, air conditioning, and plumbing equipment and fixtures), (d) all loading docks serving the Premises, and (e) all other items that are not Landlord's responsibility under <u>Section 5.02</u>, in conformity with governmental regulations and all rules and regulations of the Board of Fire Underwriters, in good order, condition, maintenance and repair. ***.

5.02 <u>Maintenance by Landlord</u>. Subject to <u>Section 6.02</u> and <u>Article 9</u>, the structural columns and supports, the roof, exterior walls and the foundations of the Parking Facility, shall be maintained by Landlord, except to the extent the condition requiring such repairs resulted from the act, negligence, willful misconduct or fault of Tenant or any of Tenant's Parties.

* * *

9.01 <u>Destruction of the Premises</u>. Tenant shall give immediate notice to Landlord in case of fire or accidents, or damage to or of defects in the Premises or in the Parking Facility. In the event that the Parking Facility shall be damaged or destroyed by fire or other cause, whether whole or partial, notwithstanding that the Premises may be unaffected by such fire or other cause, Landlord shall have the right, to be exercised by notice in writing delivered to the Tenant within 30 days after said occurrence, to cancel

and terminate this Lease. *** If Landlord does not elect to cancel this Lease as aforesaid, then the same shall remain in full force and effect and Landlord shall proceed with all reasonable diligence to repair and replace the Premises to the Condition they were in prior to the date of such destruction, and during the time the Premises are so destroyed and totally untenantable, the rent shall be abated unless the acts or omissions of Tenant *** shall have caused said damage or destruction. In the event Landlord elects to repair and restore Premises, Landlord shall not be required to expend such sums to repair or restore the Parking Facility which are greater than the amount of insurance proceeds actually received by Landlord to compensate Landlord for said damage or destruction to Parking Facility.

* * *

10.01 Default. The following shall constitute an "*Event of Default*" under this Lease: (a) Tenant's failure to make, within 5 days after the date when due, any payment of rent, percentage of rent, additional rent or other charge payable by Tenant hereunder or to timely discharge any other monetary obligation; ***

10.02 Remedies. Upon the occurrence of any Event of Default, Landlord shall have the option to pursue any or more of the following remedies (as well as any other remedies provided by law or equity) without any notice or demand whatsoever: *** (b) terminate this Lease and declare immediately due and payable the entire amount of all rent remaining to be paid under this Lease for the balance of the Lease term; ***

10.03 Legal Expenses. In the event either party hereto institutes a legal action or proceedings against the other party hereto relating to the provisions of this Lease or any default hereunder, the prevailing party in such legal action or proceeding shall be

entitled to recover *** all out of pocket expenses incurred in connection with such action or proceedings, including reasonable attorneys' fees to the extent permitted by Law."

The lease also stated under "Article 3: SECURITY" the following:

"Landlord shall not be liable to Tenant, and Tenant hereby waives any claim against Landlord for (a) any unauthorized or criminal entry of third parties into the Premises or Parking Facility, (b) any damage to persons or property, or (c) any loss of property in and about the Premises or Parking Facility from any unauthorized or criminal acts of third parties ***."

¶ 7    Nooria made 249 timely rental payments under the lease. In March 2020, the COVID-19 pandemic caused Nooria's sales to decrease by 60 to 80%. Urban allowed Nooria and other tenants to defer rent for April and May of 2020.

¶ 8    On May 30, 2020, civil unrest in downtown Chicago resulted in a fire that significantly damaged the Dunkin Donuts store on West Adams. Nooria notified Urban of the fire via phone and email, and Urban's agent, Neal Todd, inspected the premises the following day. Todd observed that the store's countertop was charred, and lighting or part of the HVAC system was pulled from the ceiling by firefighters. Photographs of the premises showed burned equipment and inventory, as well as the damage from firefighters. Amin testified that the photographs accurately depicted damage from the fire. The "whole restaurant" was burned, and the store could not operate in the premises as a result.

¶ 9    In June 2020, Nooria filed insurance claims for property damage and business interruption with its insurance carrier, Liberty Mutual. Nooria also sought rent abatement from Urban but did not receive a response. On October 20, 2020, Nooria informed Urban that the insurance proceeds

from Liberty Mutual, approximately $199,600, did not cover all of the necessary repairs because the insurer believed Urban was responsible for certain repairs.

¶ 10    Nooria received additional insurance proceeds in November 2020 to replace equipment and fixtures but, according to Amin, the proceeds did not cover all of the repairs needed to reopen the store. Amin personally paid $69,000 towards rebuilding the store. Nooria informed Urban that it could not pay rent for several more months but hoped "the situation would improve." Nooria again requested rent relief, but Urban did not respond.

¶ 11    On December 23, 2020, Urban served Nooria with a five-day notice of eviction and demand for rent. After receiving the notice, Nooria requested a loan from Urban in order to complete the repairs and reopen the store. According to Amin, only work on the lighting, wiring, and sprinkler system remained. If Urban would provide a loan, Nooria could "finish it up." After completion of this work, it would take "[l]ess than seven days" to reopen the Dunkin Donuts store.

¶ 12    Urban, however, refused the loan because remodeling had not begun, and the business was not earning money. It also believed that Nooria's business interruption insurance claim would cover rent payments. Since "time is of the essence" with such claims, Urban wanted to see Nooria's "construction remodeling project begin as soon as possible."

¶ 13    When Nooria did not respond to the five-day notice of eviction or pay the rent due, Urban filed an eviction action on May 6, 2021. Nooria filed a motion to dismiss the action, arguing that Article 9 of the lease required Urban to repair the premises. The trial court denied the motion and set the matter for trial.[1]

---

[1] Nooria filed a declaratory judgment action on January 2, 2022, seeking a declaration that Article 9 applied and therefore, Urban breached the lease. The complaint was dismissed on February 1, 2023.

¶ 14    At trial, Urban argued that Nooria "has paid zero ($0.00) dollars in rent since March of 2020." Urban tried to work with Nooria after fire damaged the premises in May of 2020, but became concerned with Nooria's delay in rebuilding the premises. Nooria never notified Urban that it believed Article 9 of the lease obligated Urban to repair the premises. The lease required notification to the landlord by certified mail or overnight delivery service. Urban further argued that Nooria essentially claimed constructive eviction. However, Nooria never vacated the property, and when a commercial tenant remains in possession of a leased property, it has an obligation to pay rent under the lease. As damages, Urban requested only 50% of the total amount of unpaid rent, or $191,009.71, as a show of good faith.

¶ 15    Nooria argued that it provided actual notice to Urban regarding the fire in the premises. Furthermore, Article 9 of the lease required Urban to either terminate the lease when fire destroyed the premises, or if it did not terminate the lease, to abate Nooria's rent payments. Since Urban did not terminate the lease, Nooria owed no rent. Nooria also raised frustration of commercial purpose and impossibility as a defense to its failure to pay rent under the lease.

¶ 16    After considering the parties' arguments, the trial court entered a judgment in favor of Urban for $100,000. The court explained:

> "I mean the real shame in a case like this is that anybody has monetary damage, other than the ones who burned down the building. They are the ones who should pay for it, every penny of everything but who can find them. We don't know who they are.
>
> And obviously it was a terrible tragedy. And, you know, the law of Illinois *** is very clear on really three things.
>
> A, that, you know, obviously rent has to be paid, of course, that is the basic law, it has been the law in Illinois for years.

There is also law very clear that the doctrine of impossibility is a legitimate doctrine in Illinois.

Also, it is very clear that the doctrine of frustration of commercial purpose has been a doctrine in Illinois for many, many years.

And the question really is in a case like this, can these three doctrines really be reconciled.

\* \* \*

But the reality is that there just isn't any great way to reconcile anything in this case.

\* \* \*

And so what I tried to do in this case is what I thought was the fairest thing and, you know, it may not make everybody happy, but I think given the way the law is in Illinois, I think it is the fairest thing.

And that there had to be some kind of judgment in this case, but it couldn't be for the full amount.

So what I did was I came to the conclusion that I think the fairest judgment, and I'm not happy about having to do this, I think the fairest for either side is – would be a $100,000 judgment in favor of plaintiff."

¶ 17    Urban filed a petition for attorney fees and costs in the amount of $29,370.53. Nooria objected, arguing that because Urban did not recover all of its damages, it was not a prevailing party under the lease.

¶ 18    After a hearing on the petition, the trial court found that:

"the attorney's fees are all proper, there is nothing improper about them. The only real question is, \*\*\* does fairness dictate that I should award them in this case.

- 8 -

Clearly those were fees that were earned. The costs are the costs.

And I have determined that I am going to deny the motion for fees and costs here. And that's not to say they weren't legitimate, it is just I think in my discretion I'm just not going to."

¶ 19    Nooria timely appealed the trial court's judgment that Nooria owed Urban damages pursuant to the lease. Urban filed a timely cross-appeal, arguing that, as the prevailing party under the lease, it was entitled to an award of attorney fees and costs.

¶ 20                                    II. ANALYSIS

¶ 21                                A. *Nooria's Appeal*

¶ 22    Nooria does not dispute that at the time Urban filed its eviction action, Nooria was in possession of the premises and had not paid rent since March 2020. It is well-established under Illinois law that liability for rent continues so long as the tenant is in possession of the premises. *Jack Spring, Inc. v. Little*, 50 Ill. 2d 351, 359 (1972). It is also well-established that a commercial landlord has no common law duty to repair the premises. *City of Chicago v. American National Bank*, 86 Ill. App. 3d 960, 963 (1980). Instead, "such a duty must arise by agreement." *Id.* Moreover, even if Urban had agreed to make repairs under the lease, Nooria's obligation to pay the rent and Urban's promise to make repairs are separate and independent covenants. *Zion Industries, Inc. v. Loy*, 46 Ill. App. 3d 902, 906 (1977). Therefore, Urban's alleged failure to make repairs did not discharge Nooria's obligation to pay the rent. *Id.*

¶ 23    Nooria, however, contends it was the parties' intent, as expressed in Article 9 of the lease, that Urban repair fire damage to the premises and allow Nooria to cease rent payments as long as the premises remained damaged. To determine whether Article 9 excused Nooria from making rental payments, we must interpret language in the lease.

¶ 24    Courts apply general contract principles when construing the terms of a rental lease. *Fox v. Commercial Coin Laundry Systems*, 325 Ill. App. 3d 473, 475 (2001). The primary goal of contract interpretation is to give effect to the parties' intent as expressed by the plain and ordinary language in the contract. *Joyce v. DLA Piper Rudnick Gray Cary LLP*, 382 Ill. App. 3d 632, 636-37 (2008). If the language is clear and unambiguous, the parties' intent is determined solely by the contract's language. *FTI International, Inc. v. Cincinnati Insurance Co.*, 339 Ill. App. 3d 258, 259-60 (2003). We construe contracts as a whole, viewing each provision in light of the other provisions. *Thompson v. Gordon*, 241 Ill. 2d 428, 441 (2011). "The parties' intent is not determined by viewing a clause or provision in isolation, or in looking at detached portions of the contract." *Id.* The interpretation of a lease presents a question of law we review *de novo*. *Plambeck v. Greystone Management & Columbia National Trust Co.*, 281 Ill. App. 3d 260, 266 (1996).

¶ 25    Nooria argues that Article 9 of the lease requires Urban to repair fire damage to the Dunkin Donuts store, which the lease refers to as the "Premises." We note, however, that Article 9 distinguishes the "Premises" from the "Parking Facility." Other provisions of the lease make the same distinction. For example, Article 5 requires Nooria to repair, maintain, and replace "the interior of the *Premises*," including "exterior entrances, all glass, windows, and window moldings *** all fixtures, partitions, ceilings, floor coverings and utility lines in the Premises," and doors, "equipment, machinery, and appliances (including lighting, heating, air conditioning, and plumbing equipment and fixtures." (Emphasis added.) This obligation extends to "all other items that are not Landlord's responsibility under Section 5.02." Pursuant to section 5.02, Urban must maintain "the structural columns and supports, the roof, exterior walls and the foundations of the *Parking Facility*." (Emphasis added.) It is apparent from the unambiguous language of the lease

that the parties viewed the Dunkin Donuts store as a functionally independent entity from the parking facility.

¶ 26    Article 9 provides that "[i]n the event that the Parking Facility shall be damaged or destroyed by fire" and the "Landlord does not elect to cancel this Lease," the landlord shall "repair and replace the Premises to the condition they were in prior to the date of such destruction, and during the time the Premises are so destroyed and totally untenantable, the rent shall be abated." By its plain terms, this provision applies when the *Parking Facility* is "damaged or destroyed by fire or other cause ***." (Emphasis added.) The terms "such destruction" and "so destroyed" thus refer to destruction caused by fire in the parking facility. Accordingly, rent abatement does not apply in every case where fire damages the premises. Rather, it applies when a fire that damaged the parking facility also damaged the premises.

¶ 27    Here, there is no evidence in the record that the fire damaged the parking facility outside of the premises. Todd observed only that the countertop in Dunkin Donuts was charred, and lighting or part of the premises' HVAC system was hanging from the ceiling. Photographs showed burned equipment and inventory, as well as other damage within the store. Amin testified that the photographs accurately depicted damage from the fire. Since the fire occurred in the premises and damaged only the premises, Article 9 did not apply to abate Nooria's rent. Therefore, Nooria cannot rely on Article 9 to excuse its nonpayment of rent.

¶ 28    Moreover, we agree with Urban that Article 3 of the lease defeats Nooria's claim that Urban was liable for some of the damages to the premises. Pursuant to Article 3, Nooria waived "any claim" against Urban for "any damage to persons or property" or loss of property in the premises due to the "unauthorized or criminal acts of third parties." Here, protestors entered Dunkin Donuts

without permission, looted the store, and set the store on fire causing damage to the premises. This is the very circumstance covered by the plain language of Article 3.

¶ 29    We next consider Nooria's argument that the affirmative defense of commercial frustration/impossibility negated Urban's claim for possession and damages under the lease.

¶ 30    The doctrine of commercial frustration or impossibility excuses performance under a contract "where performance is rendered objectively impossible due to destruction of the subject matter of the contract or by operation of law." *YPI 180 N. LaSalle Owner, LLC v. 180 N. LaSalle II, LLC*, 403 Ill. App. 3d 1, 6 (2010). To excuse rental payments under a lease, a lessee must show (1) the frustrating event was not reasonably foreseeable; and (2) the value of lessee's performance was totally or nearly totally destroyed by the frustrating cause. *Smith v. Roberts*, 54 Ill. App. 3d 910, 912-13 (1977). This doctrine is narrowly applied " 'due in part to judicial recognition that the purpose of contract law is to allocate the risks that might affect performance and that performance should be excused only in extreme circumstances.' " *YPI 180 N. LaSalle*, 403 Ill. App. 3d at 6, (quoting *Kel Kim Corp. v. Central Markets, Inc.*, 70 N.Y.2d 900, 902 (1987)). Impossibility is an affirmative defense which the claiming party has the burden to prove. *Pepper Construction Co. v. Palmolive Tower Condominiums, LLC*, 2021 IL App (1st) 200753, ¶ 87.

¶ 31    Nooria argues that it satisfied the first element because no one could foresee that civil unrest would cause a fire in the Dunkin Donuts store. We disagree. Although the parties may not have foreseen that protestors would cause fire damage to the store, the pertinent issue is whether they could foresee that a fire might damage the store. See *YPI 180 N. LaSalle*, 403 Ill. App. 3d at 7 (finding that although commercial financing became impossible to procure due to an unforeseen global credit crisis, the "primary issue" was whether the purchasers could reasonably foresee that a commercial lender might not provide the financing they sought). In other words, we look at

whether the frustrating event itself was foreseeable rather than the cause of the frustrating event. It was certainly foreseeable that the Dunkin Donuts store could be damaged by fire.

¶ 32 Furthermore, the doctrine of impossibility does not apply if it is " 'within the power of the promisor to remove the obstacle to performance.' " *Id.* at 8 (quoting *Felbinger & Co. v. Traiforos*, 76 Ill. App. 3d 725, 733 (1979)). In *YPI 180 N. LaSalle*, this court found that although the potential purchasers could not obtain the financing they expected, nothing in the record indicated that they lacked sufficient assets to pay the contract price. *Id.* Therefore, failure to obtain the financing they sought was insufficient grounds to rescind the contract under the doctrine of impossibility. *Id.*

¶ 33 Here, Amin's testimony indicated that most of the renovations had been done. He testified that only repairs to the lighting and sprinkler system remained, and the store would be open within a week once this work was completed. Also, Nooria received insurance proceeds totaling more than $200,000 for the renovation. Although Amin testified that the funds were insufficient to cover all of the necessary repairs, he provided no evidence to support his claims. Like the purchasers in *YPI 180 N. LaSalle*, Nooria did not present evidence that it lacked sufficient assets or equity to complete the repairs. As such, Nooria has not met its burden of proving impossibility.

¶ 34 We find that neither Article 9 of the lease, nor the doctrine of commercial frustration/impossibility, excused Nooria's nonpayment of rent. Therefore, we affirm the trial court's judgment granting Urban possession of the premises and awarding Urban $100,000 in damages. The parties do not challenge the amount of damages on appeal.

¶ 35 Due to our determination that Article 9 did not excuse Nooria's nonpayment of rent, we need not consider Nooria's argument that it gave Urban proper notice under Article 9, or that the trial court improperly admitted evidence that was irrelevant to the application of Article 9.

¶ 36                                  B. *Urban's Cross-Appeal*

¶ 37    Urban contends on cross-appeal that it was entitled to attorney fees under the lease as the prevailing party in the litigation. Nooria argues that Urban is estopped from making this claim because it took a contrary position in the trial court below. According to Nooria, since Urban argued in the eviction proceedings that the parties' obligations under the lease are not germane to the issue of possession, Urban cannot now claim that it is entitled to attorney fees under the fee-shifting provision of the lease.

¶ 38    We disagree that Urban has taken a contrary position in its cross-appeal. Urban argues that it is entitled to attorney fees pursuant to the fee-shifting provision of the lease. It is undisputed that Urban and Nooria executed the lease, which is an agreement giving rise to the landlord and tenant relationship. *Midland Management Co. v. Helgason*, 158 Ill. 2d 98, 103, 630 N.E.2d 836, 839 (1994). As with any contract, the provisions of the lease control the rights of the parties. *Id.* Urban never argued below that the lease was invalid or that the parties were not bound by the lease. We therefore consider Urban's attorney fee argument.

¶ 39    Illinois follows the "American rule," which prohibits the prevailing party from recovering attorney fees from the losing party unless recovery is allowed by an express statutory or contractual provision. *Oak Forest Properties, LLC v. RER Financial, Inc.*, 2018 IL App (1st) 161704, ¶ 12. Since an award of attorney fees to the prevailing party is in derogation of common law, courts strictly construe these provisions. *Forest Preserve District v. Continental Community Bank & Trust Co.*, 2017 IL App (1st) 170680, ¶ 31. We will " 'construe the fee-shifting provision to mean nothing more – but also nothing less – than the letter of the text.' " *Bright Horizons Children's Centers, LLC v. Riverway Midwest II, LLC*, 403 Ill. App. 3d 234, 255 (2010) (quoting *Erlenbush v. Largent*, 353 Ill. App 3d 949, 952 (2004)).

¶ 40    Here, the lease provided that the "prevailing party" in an action relating to provisions of

the lease "or any default hereunder, *** shall be entitled to recover *** reasonable attorneys' fees to the extent permitted by Law." Urban argues that it was awarded possession of the premises and damages due to Nooria's default under the lease and, as such, it was a prevailing party entitled to attorney fees. This issue involves interpretation of the lease's fee-shifting provision, which presents a question of law we review *de novo. Bright Horizons*, 403 Ill. App. 3d at 255.

¶ 41 A party is considered a prevailing party for purposes of a fee-shifting provision if it succeeds on any significant issue and achieves some benefit in bringing the action, receives a favorable judgment, or obtains an affirmative recovery. *Grossinger Motorcorp, Inc. v. American National Bank and Trust Co.*, 240 Ill. App. 3d 737, 753 (1992). A litigant is a prevailing party even if it did not receive the full amount of requested damages. *J.B. Esker & Sons, Inc. v. Cle-Pa's Partnership*, 325 Ill. App. 3d 276, 282 (2001). If a dispute involved multiple claims and both parties won and lost on different claims, a court could find that neither party prevailed and an award of attorney fees to either party would be inappropriate. *Oak Forest Properties*, 2018 IL App (1st) 161704, ¶ 13.

¶ 42 Urban filed a complaint alleging that Nooria defaulted under the terms of the lease, and as a result, Urban sought possession of the premises and monetary damages. After a bench trial, the court awarded possession to Urban and also ordered Nooria to pay Urban $100,000 in damages. The court acknowledged the merits of the parties' arguments but decided it could not "reconcile" both sides. The court ultimately found that "there had to be some kind of judgment" for Urban, but not for the full amount. Urban thus succeeded on the core issue in its complaint and obtained a benefit, even if it did not receive its full measure of damages. We find that Urban was a prevailing party for purposes of the fee-shifting provision. See *Tomlinson v. Dartmoor Construction Corp.*, 268 Ill. App. 3d 677, 687 (1994) (finding that the plaintiffs were the sole prevailing party where

"the trial court entered judgment in favor of plaintiffs and against defendant and ordered defendant to pay plaintiffs the amount of the judgment").

¶ 43    Although we find Urban was the prevailing party, our inquiry does not end there. "When a contract calls for the shifting of attorney fees, a trial court should award all reasonable fees." *J.B. Esker*, 325 Ill. App. 3d at 282. To make this determination, the trial court considers the following factors: " 'the skill and standing of the attorneys employed, the nature of the case, the novelty and difficulty of the issues involved, the degree of responsibility required, the usual and customary charge for the same or similar services in the community, and whether there is a reasonable connection between the fees charged and the litigation.' " *In re Pine Top Insurance Co.*, 292 Ill. App. 3d 597, 604 (1997) (quoting *Harris Trust & Savings Bank v. American National Bank & Trust Co.*, 230 Ill.App.3d 591, 595–96 (1992)). A reviewing court will not disturb the trial court's determination absent an abuse of discretion. *U.S. Fidelity & Guaranty Co. v. Old Orchard Plaza Limited Partnership*, 333 Ill. App. 3d 727, 740 (2002).

¶ 44    In the petition and at the hearing, Urban argued that it included "conservative billing entries" reflecting time spent on the matter, and that their attorneys were experienced. Furthermore, its attorneys reduced their hourly charge for this case to a rate well-below that of comparable practitioners in the Chicago area. Urban claimed that "the vast majority of attorney time expend[ed] in this matter was due to the litigation decisions made by [Nooria's] counsel." The petition requested attorney fees in the amount of $28,759, and $611.13 in costs.

¶ 45    The trial court found that the attorney fees were "earned" and "proper." The court, however, questioned whether "fairness dictate that I should award them in this case." In declining to award attorney fees, the trial court stated, "that's not to say they weren't legitimate, it is just I think in my discretion I'm just not going to." The court provided no further explanation and its

written order stated only that Urban's "petition for attorneys' fees and costs is denied."

¶ 46 It is well-established that the trial court has broad discretion to independently review and consider the entire record in determining whether the fees requested are reasonable. *Wildman, Harrold, Allen & Dixon v. Gaylord*, 317 Ill. App. 3d 590, 596–97 (2000). However, the trial court's discretion is not boundless. We have found an abuse of discretion when the trial court failed to explain why it reduced the amount of attorney fees requested pursuant to a fee-shifting provision. See *Wendy & William Spatz Charitable Foundation v. 2263 N. Lincoln Corp.*, 2013 IL App (1st) 122076, ¶ 42 (remanding for a fee petition hearing where the trial court did not provide an "objective basis" for its drastic reduction of fees or explain "the rationale behind the amount by which they were reduced"); see also *Richardson v. Haddon*, 375 Ill. App. 3d 312, 316 (2007) (remanding for another fee petition hearing so the trial court could "either award those fees that it decides are reasonable or clearly state the reasons for the particular reductions").

¶ 47 Here, the trial court found that the attorney fees were "earned" and "proper." The court, however, denied Urban's fee petition in its entirety even though the lease entitled Urban, as the prevailing party, to "reasonable attorneys' fees" in connection with the action. Pursuant to the lease, the trial court could deny fees only if they are unreasonable. See *Chandra v. Chandra*, 2016 IL App (1st) 143858, ¶ 17 (when a contractual provision is clear and unambiguous, courts must enforce it as written). Although the trial court considered whether it was fair to award fees in this case, it did not articulate why it found Urban's attorney fees proper but unreasonable. We therefore remand the matter for a fee petition hearing when the trial court can make findings on the reasonableness, or unreasonableness, of Urban's attorney fees. See *Spatz Charitable Foundation*, 2013 IL App (1st) 122076, ¶ 42.

¶ 48                                    III. CONCLUSION

¶ 49      For the foregoing reasons, we affirm the judgment of the trial court awarding damages and possession of the premises to Urban. We remand the cause, however, for further proceedings on Urban's petition for attorney fees and costs.

¶ 50      Affirmed in part and remanded in part.